**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| DAVID CARTER, CLAYTON GRAHAM, JR., and MITCHELL WEBSTER, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.: 5:12-CV-209 (LJA) |
| | : | |
| BUTTS COUNTY, GEORGIA, | : | |
| SHERIFF GENE POPE, Individually | : | |
| and in his Official Capacity, | : | |
| TIMOTHY FILBECK, Individually | : | |
| and in his Official Capacity, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER

Before the Court are Defendants' Motion for Summary Judgment (Doc. 46), Plaintiffs' Motion to Strike (Doc. 65), and Defendants' Motion for Leave to File Reply Brief (Doc. 66). For the reasons explained below, Defendants' Motion for Summary Judgment (Doc. 46) is **GRANTED** in part and **DENIED** in part, Plaintiffs' Motion to Strike (Doc. 65) is **DENIED**, and Defendants' Motion for Leave to File Reply Brief (Doc. 66) is **GRANTED**.

## PROCEDURAL HISTORY

Plaintiffs David Carter, Clayton Graham, Jr., and Mitchell Webster commenced this action on June 7, 2012, alleging violations of their federal and state law rights. (Doc. 1.) Plaintiffs subsequently amended their Complaint on February 14, 2014, asserting federal constitutional tort claims, pursuant to 42 U.S.C. § 1983, for arrest without probable cause as well as state law claims for negligent hiring and retention and conversion. (Doc. 22.) Plaintiffs brought these claims against Butts County, Georgia ("Butts County"), Sheriff Gene Pope ("Sheriff Pope), individually and in his official capacity, and Lieutenant Timothy

Filbeck ("Lieutenant Filbeck"), individually and in his official capacity. (*Id.*) On March 10, 2014, Defendants moved for summary judgment on the following grounds: (1) Plaintiffs' § 1983 claims against Lieutenant Filbeck are barred by the existence of probable cause and qualified immunity; (2) neither Butts County nor Sheriff Pope engaged in any activities that would give rise to liability under § 1983; (3) Sheriff Pope, in his official capacity, is entitled to Eleventh Amendment immunity; (4) Butts County is not amenable to suit for the actions of the Butts County Sheriff or his employees; (5) Sheriff Pope and Lieutenant Filbeck are entitled to official immunity as to Plaintiffs' state law claims; and (6) Plaintiffs have failed to state a claim for conversion. (*See* Doc. 46-1.)

On April 3, 2014, Plaintiffs filed their Response. (Doc. 52.) On April 17, 2014, Defendants requested a fourteen-day extension pursuant to Local Rule 6.2 to file a reply brief, which the Clerk of the Court granted. (Doc. 61.) Although Defendants' reply brief was due on May 1, 2014, because of a purported calendaring error, Defendants did not file their Reply until May 5, 2014. (Doc. 64.) Plaintiffs thereafter moved to strike Defendants' Reply. (Doc. 65.) In response, Defendants filed a Motion for Leave to Accept their Reply (Doc. 66) as well as a Response to Plaintiffs' Motion to Strike. (Doc. 67.) The forgoing motions are now ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

## MOTION TO STRIKE

As a preliminary matter, the Court will address Plaintiffs' Motion to Strike (Doc. 65) and Defendants' Motion for Leave to Accept their Reply (Doc. 66), both of which will be construed together. Plaintiffs contend that the Court should strike Defendants' Reply because it was filed four days late. Defendants, on the other hand, argue that the Court should grant them an enlargement of time and accept their untimely Reply because the delay in filing was due to a simple calendaring error.

Under Rule 6(b) of the Federal Rules of Civil Procedure, a request for an enlargement of time after the time to respond has elapsed may only be granted for good cause where the movant has demonstrated excusable neglect. Fed. R. Civ. Pro. 6(b)(1)(B). In determining whether a party's neglect is excusable under Federal Rule 6(b), courts consider the following factors: "(1) the danger of prejudice to the opposing party, (2) the length of delay and its

potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." *Glover v. City of Pensacola*, 372 Fed. Appx. 952, 955 n.6 (11th Cir. 2010) (citing *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). This determination is primarily "an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395.

Weighing the *Pioneer* factors, the Court finds that Defendants' neglect in filing their Reply four days late is excusable. First, Plaintiffs will not be prejudiced by the consideration of Defendants' Reply. Second, a delay of four days has no impact on these judicial proceedings or the efficient administration of justice. Third, the reason for delay was the failure of defense counsel's administrative assistant to properly calendar the correct due date – the type of "innocent oversight" that courts in this Circuit have repeatedly deemed excusable. *See Walter v. Blue Cross & Blue Shield United of Wis.*, 181 F.3d 1198 (11th Cir. 1999) (finding excusable neglect where "the reason for the delay was the failure of a former secretary of [plaintiff's] attorney to record the applicable deadline"); *Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 850 (11th Cir. 1996) (finding that the late filing was due to excusable neglect, as it "was simply an innocent oversight by counsel" that resulted from a breakdown in communication between attorneys). Finally, there is no evidence that counsel for Defendants acted in bad faith. Accordingly, the Court will consider Defendants' Reply as though timely filed.

## **FACTUAL BACKGROUND**

This action arises out of the alleged unlawful arrest of Plaintiffs as they were cleaning out the foreclosed home of Lieutenant Filbeck, a lieutenant in the Butts County Sheriff's Office, on February 22, 2011.[1]

---

[1] The relevant facts are derived from the Amended Complaint (Doc. 22), Defendants' Answer to the Amended Complaint (Doc. 24), Defendants' Statement of Undisputed Facts (Doc. 46-2), Plaintiffs' Response to Defendants' Statement of Material Facts (Doc. 53), Plaintiffs' Statement of Material Facts (Doc. 54), and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to Plaintiffs as the nonmoving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## I.   <u>Arrest of Plaintiffs</u>

Lieutenant Filbeck and his wife purchased the property located at 191 Quail Trail, Jackson, Georgia 30233 (the "Property") on March 29, 2005. (Doc. 59 at 38-70.) In connection with the purchase, Lieutenant Filbeck executed a Security Deed, dated March 29, 2005 (the "Security Deed"). (Doc. 59 at 59-69.) Section 9 of the Security Deed states, in relevant part, that "[i]f (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property . . . including protecting and/or assessing the value of the Property, and securing and/or repairing the Property." (Doc. 59 at 64.)

Beginning in 2007, Lieutenant Filbeck fell behind on his mortgage payments, causing him to file for bankruptcy. (Doc. 46-2 at ¶ 3.) The bankruptcy petition was subsequently dismissed in 2009, after Lieutenant Filbeck successfully reached an agreement with his creditors. (Doc. 46-2 at ¶ 4.) However, by July 2010, Lieutenant Filbeck had again fallen into default (Doc. 59 at 119-21); and, as early as September 2010, Ocwen Loan Servicing LLC ("Ocwen") initiated foreclosure proceedings on the Property. (Docs. 46-2 ¶ 6.) Ocwen notified Lieutenant Filbeck of the impending foreclosure by letters dated September 22, 2010 and November 22, 2010. (Docs. 37 at 36:14-20, 92:19-21; 59 at 29-36.)  Ocwen also placed notices of the foreclosure sale in the local paper in December 2010, and Lieutenant Filbeck acknowledged that he saw those notices. (Doc. 37 at 48:4-9, 64:18-20, 92:22-24; *see also* Doc. 59 at 100.)

Lieutenant Filbeck and his family ceased residing at the Property in early November 2010, and moved to 446 James Moore Drive, where they ate, slept, and began receiving mail. (Doc. 37 at 7:13-22, 45:5-12, 51:13-19, 81:7-82:14.) The Filbecks also discontinued the utilities on the Property sometime in November or December 2010. (Docs. 37 at 46:8-47:17; 52-1 at ¶ 10; 52-3 at ¶ 9; 59 at 80, 88-99.) Ultimately, the Property was foreclosed on January 4, 2011, and conveyed by a deed under power of sale (the "Deed Under Power") to U.S. Bank National Association, as Indenture Trustee for the Registered Holders of Aegis Asset Backed Securities Trust 2005-2, Mortgage Backed Notes, by and through its duly appointed

attorney-in-fact, Ocwen.[2] (Doc. 45 at 161-63.) Lieutenant Filbeck's ownership interest in the Property was thus extinguished on January 4, 2011. Nothing in the record suggests that Lieutenant Filbeck ever sought to challenge the foreclosure.

On or about December 12, 2010, Altisource Portfolio Solutions ("Altisource"), Ocwen's agent and property manager, contracted with MD Maintenance, LLC ("MDM") to prepare the Property for resale. (Doc. 52-1 at ¶ 9.) MDM regularly contracts with financial institutions to provide maintenance services for residential properties, including preparing foreclosed homes for resale. (Doc. 52-1 at ¶ 5.) Danny and Tina Carter have owned MDM for approximately twelve years and have worked with Ocwen and Altisource since MDM's inception. (Docs. 52-1 at ¶ 6; 52-3 at ¶¶ 4-5.) As part of its standard procedure for preparing a foreclosed home for resale, MDM first determines whether the home is still occupied or has been abandoned. (Docs. 52-1 at ¶ 7; 52-3 at ¶¶ 6-7.) If the home is still occupied, MDM notifies Altisource, which then initiates eviction proceedings. (*Id.*) If the home has been abandoned, MDM will typically change the locks, take pictures of the home, clean out the home, repair any damage, and place signs on the home notifying any person with questions to contact MDM. (*Id.*) As described in detail below, MDM followed its standard procedure with respect to the Property, first determining whether the Property was abandoned and then taking pictures of the Property, cleaning it out, and affixing a notice directing anyone with questions to contact MDM.

After being contracted by Altisource, MDM conducted due diligence on the Property to ensure that no one was still residing there. (Docs. 52-1 at ¶ 7; 52-3 at ¶ 6.) Between December 12, 2010 and January 15, 2011, MDM visited the Property on multiple occasions and found the home empty with no heat or electricity and "cobwebs from wall to wall in almost every room." (Doc. 52-2 at ¶ 12; *see also* Doc. 52-1 at ¶ 10.) MDM also confirmed that

---

[2] Under Georgia law, once a deed under power of sale is issued to a successful bidder at the foreclosure sale, the sale is final and the debtor's right of redemption is extinguished. *See Tampa Inv. Grp., Inc. v. Branch Banking & Trust Co.*, 723 S.E.2d 674, 677 (2012) ("[U]nder Georgia law, a debtor's equity of redemption terminates on the date that the foreclosure auction is held when the high bid is received."); *Cummings v. Johnson*, 129 S.E.2d 762, 763 (1963) ("A sale under the powers contained in a deed to secure debt divests the grantor of all title, and right of equity of redemption, to the lands described in the deed."). In other words, Georgia has no statutory right of redemption allowing a party whose property has been foreclosed to reclaim that property.

the utilities on the Property had been discontinued. (Docs. 52-1 at ¶ 10; 52-3 at ¶ 9.) In addition, Tina Carter personally spoke with a neighbor of the Property who confirmed that no was living there. (Doc. 52-1 at ¶ 10.) As such, MDM determined that the Property had been abandoned.

On or about January 18, 2011, Danny Carter, along with three other MDM employees, Plaintiff Graham, Jordan Harrington and Greg Carter, went to the Property to assess its condition and begin preparing it for resale. (Docs. 52-1 at ¶ 11; 52-2 at ¶ 5). They affixed a notice to the front door (the "Notice"), which stated that the Property had been foreclosed upon, that Ocwen and Altisource had taken control of the Property, and that any questions regarding the Property should be directed to MDM. (*See id.*; *see also* Doc. 59 at 115.) Greg Carter photographed the Notice and sent it to Altisource. (Doc. 52-2 at ¶ 5.) When Plaintiff Graham, along with other MDM employees returned to the Property on January 29, 2011, to continue cleaning it out, the Notice was still affixed to the front door. (Doc. 54 at ¶ 28.)

On or about January 30, 2011, Lieutenant Filbeck visited the Property and discovered that some of his personal property was missing. (Doc. 46-2 at ¶ 20.) Although the Notice was allegedly still affixed to the front door, Lieutenant Filbeck did not contact anyone at Ocwen, Altisource, or MDM regarding their entry into the home or the removal of any property. (Docs. 52-1 at ¶¶ 13, 25; 52-2 at ¶ 10.) Instead, he boarded up the windows, nailed the doors shut, and replaced the Notice with four keep-out signs. (Doc. 46-2 at ¶ 21.) In addition, he allegedly filed a false police report under the name of Sergeant Kenneth Mundy (*compare* Doc. 59 at 12-14, *with* Doc. 42 at 5-7), and submitted a fraudulent insurance claim to Liberty Mutual Insurance for his missing property.[3] (Doc. 42 at 19-25.) Sergeant Mundy subsequently discovered the police report and demanded that his name be removed from it, stating that he did not prepare it, authorize it, or know anything about it prior to discovering it sometime after Plaintiffs were arrested.  (Doc. 43 at 34:19-36:8.)

The following day, on or about January 31, 2011, Plaintiff Graham and Greg Carter returned to the Property to finish cleaning it out when they discovered that the windows had

---

[3] Liberty Mutual subsequently made a $7,785.11 payment to satisfy the claim. (Doc. 42 at 32.)

been boarded, the doors nailed shut, and the Notice removed and replaced by the keep-out signs. (Doc. 52-2 at ¶¶ 6-7, 9.) Greg Carter called Tina Carter to inquire as to how he should proceed. (Docs. 52-1 at ¶ 13; 52-2 at ¶ 8.) Tina Carter first called Altisource to confirm that the Property had in fact been foreclosed upon and that MDM was authorized to be there. (Doc. 52-1 at ¶ 14.) After receiving confirmation from Altisource, Tina Carter called the Butts County Sheriff's Office. She explained the situation to the dispatcher, and requested that an officer meet with MDM at the Property. (Doc. 52-1 at ¶¶ 14-16.) The Butts County Sheriff's Office subsequently dispatched Officer Thomas Middleton and another unknown officer to the scene. Greg Carter explained to Officer Middleton that the Property had been foreclosed upon by Ocwen, who had in turn hired his employer, MDM, to prepare the Property for resale. (Doc. 52-2 at ¶¶ 11-12.) Greg Carter further explained that MDM had determined that the home was abandoned "based on the fact that there was mold in the sink, no power to the house and cobwebs from wall to wall in almost every room." (Doc. 52-2 at ¶ 12.) At his deposition, Officer Middleton testified that it was clear that no one was living at the Property as of January 31, 2011. (Doc. 29 at 27:8-15.)

During their interaction, Greg Carter presented Officer Middleton with paperwork explaining who they were, where they worked, and what their purpose was for being at the Property. (Doc. 29 at 8:21-24, 10:9-11:4, 17:24-18-10, 29:3-4; *see generally* Doc. 59 at 115, 122.) Greg Carter also gave a written statement to Officer Middleton, explaining that he and Plaintiff Graham worked for MDM and the purpose of their visit. (Doc. 52-2 at ¶ 16.) Officer Middleton made a report of the incident in his Daily Activity Report.[4] (Doc. 29 at 18:21-20:12.) Ultimately, Greg Carter and Plaintiff Graham left the Property without entering the home because they did not want to forcibly enter without explicit permission from Altisource, and because of the delay caused by the meeting and the time of day. (Doc. 52-2 at ¶ 19.)

Officer Middleton later told Lieutenant Filbeck about his January 31, 2011 interaction with MDM personnel. (Doc. 29 at 23:20-24:5.) Although the record is not clear as to exactly

---

[4] Remarkably, Defendants have not located or produced the Daily Activity Report, despite testimony that such documents were in fact filed in the department's internal filing system. (Doc. 54 at ¶ 56.)

how many times Lieutenant Filbeck and Officer Middleton spoke about the interaction or what was discussed (*see* Doc. 29 at 23:20-30:8), during one of their conversations, Officer Middleton told Lieutenant Filbeck that Plaintiffs showed him paperwork that purportedly authorized them to clean out the Property. (Doc. 29 at 26:15-24.) Lieutenant Filbeck also asked whether Plaintiffs were the same individuals that Officer Middleton met with on January 31, 2011. (Doc. 29 at 24:1-5, 28:1-4.) Officer Middleton could not recall their names, but told Lieutenant Filbeck to check the dispatch log or his Daily Activity Report. (Doc. 29 at 24:16-25.)

On the morning of February 22, 2011, Plaintiffs Graham and Webster returned to the Property to finish cleaning it out. (Docs. 46-2 at ¶ 30.) Plaintiff Carter subsequently arrived to deliver additional trash bags. (Doc. 46-2 at ¶ 41.) Tina Carter gave each of the men a document explaining their purpose and authorizing them to be on the premises. (Doc. 52-1 at ¶ 18.) In addition, Tina Carter emailed Plaintiff Carter a copy of the Deed Under Power as well as an authorization letter from Ocwen and Altisource (the "Authorization Letter"), which confirmed that the Property had been foreclosed upon by Ocwen and that Tina Carter, as Ocwen's agent, was authorized full access to the Property. (*See* Doc. 59 at 122.) The Authorization Letter also directed anyone with questions to contact Altisource. (*See id.*)

While Plaintiffs were removing household items and trash from the flooded basement, Lieutenant Matthew Vaughn arrived at the scene. (Docs. 31 at 15:11-25; 71 at 72:9-73:15.) At that time, Plaintiffs had loaded a utility trailer with personal effects and trash from within the Property. (*Id.*) Plaintiff Carter explained MDM's purpose at the Property and presented Lieutenant Vaughn and other deputies who had subsequently arrived on the scene with the document from Tina Carter and the email with the Authorization Letter. (Docs. 31 at 18:7-9; 43 at 11:6-13; 52-1 at ¶ 22; 70 at 44:16-24; 71 at 88:4-23, 90:12-17; 72.)

Lieutenant Filbeck subsequently arrived on the scene and assumed control of the investigation. (Doc. 31 at 24:3-6.) Lieutenant Vaughn handed Lieutenant Filbeck the document from Tina Carter. (Doc. 43 at 11:6-13.) When questioned, Plaintiff Carter attempted to show Lieutenant Filbeck the Authorization Letter on his phone, but Lieutenant Filbeck refused to review it, claiming that the Authorization Letter "and the rest of this

paperwork don't [sic] mean a damn thing." (Doc. 72 at 75:15-21; *see also* Doc. 71 at 91:8-92:1.) Lieutenant Filbeck appeared to be extremely angry, cursing and shouting at Plaintiffs. (Docs. 70 at 49:24-50:24; 71 at 97:11-98:4; 72 at 78:7-22.) Plaintiff Carter then called Tina Carter to explain the situation and ask her to speak with Lieutenant Filbeck. (Doc. 71 at 92:5-21.) Tina Carter tried to explain to Lieutenant Filbeck why MDM was at the Property, but Lieutenant Filbeck refused to listen. (Doc. 52-1 at ¶¶ 23-24.) Instead, he told her that the Notice MDM affixed to the Property was a worthless piece of "shit," just like the documents Plaintiffs had in their possession. (Doc. 52-1 at ¶ 25; *see also* Doc. 71 at 123:10-125:12.) Tina Carter continued to try to reason with Lieutenant Filbeck and even gave him Danny Carter's contact information to discuss the situation. (Doc. 52-1 at ¶¶ 28, 30.) Lieutenant Filbeck, however, would not listen and even threatened to arrest Tina Carter next because she was the "ring leader." (Doc. 52-1 at ¶ 29.)

Tina Carter subsequently contacted Sheriff Pope and emailed him a copy of the Authorization Letter. (Doc. 52-1 at 31-32.) Sheriff Pope, however, allegedly refused to look at the email, telling Tina Carter that he would only review hard copies of documents. (*Id.*) Notably, Sheriff Pope testified that he did not speak with Tina Carter, nor did he know anything about the foreclosure, the actions taken by Lieutenant Filbeck on January 30, 2011, or Officer's Middleton's encounter with MDM personnel on January 31, 2011. (Doc. 35 at 48:24-49:23, 80:9-12; 226:3-8.) Tina Carter also contacted the District Attorney who likewise refused to provide assistance. (Doc. 52-1 at ¶ 32.)

Prior to ordering Plaintiffs' arrest, Lieutenant Filbeck contacted the Clerk of Superior Court of Butts County and the Butts County Sheriff's Office Warrants and Civil Papers Division to inquire about whether any eviction notices had been issued against the Property. (Doc. 46-2 at ¶¶ 62-65.) After being notified that no such notices had been filed, Lieutenant Filbeck ordered Plaintiffs' arrest for burglary. (Doc. 46-2 at ¶ 69.) Plaintiffs were transferred to the Butts County Detention Center and held until the following day, February 23, 2011, when they were released without any charges being filed. (Doc. 72 at 123:22-124:3.) At the time of their incarceration, the Butts County Sheriff's Office allegedly confiscated two cameras, silverware, and twenty dollars in cash. (Docs. 52-1 at ¶¶ 20, 38; 71 at 145:4-9, 148:7-

152:23.) The cameras purportedly contained photos of the Property that were taken to record and preserve Plaintiffs' actions there. Lieutenant Filbeck admits accessing a camera and downloading pictures onto his computer without a warrant or authorization while Plaintiffs were incarcerated. (Doc. 37 at 14:11-15:6, 73:19-74:22.) The cameras, silverware, and twenty dollars in cash have never been returned to Plaintiffs, despite requests from Tina Carter and MDM. (Docs. 52-1 at ¶ 38; 71 at 145:4-9, 148:7-152:23.)

On the day of Plaintiffs' arrest, Sergeant Mundy's father-in-law, who lived two doors down from Lieutenant Filbeck, called Sergeant Mundy to let him know that MDM personnel had returned to the Property. Sergeant Mundy's father-in-law stated that these were the same individuals that Lieutenant Filbeck had previously asked about. (Doc. 43 at 6:20-7:4) While on the scene, Sergeant Mundy also spoke to Lieutenant Vaughn and expressed his disagreement with Lieutenant Filbeck's decision to arrest Plaintiffs. (Docs. 31 at 23:7-24:13; 43 at 18:21-19:7.) Sergeant Mundy subsequently reiterated his disagreement with Lieutenant Filbeck's decision to Sheriff Pope and Colonel Mooney. (Doc. 43 at 19:10-20:3.) Sheriff Pope, however, simply responded that any officer in Filbeck's position would have done the same thing. (Doc. 43 at 20:4-9.)

## II.    GBI Investigation

In September 2009, the Georgia Bureau of Investigation (the "GBI") began investigating Major Mike Overbey at the request of Sheriff Pope and the district attorney for possible criminal charges stemming from various complaints, including misappropriation of a carburetor from an impounded vehicle, improperly impounding and purchasing a seized vehicle, theft of seized evidence, and the illegal sale and purchase of prescription pain medication. (*See* Doc. 58 (the "GBI Report").) The investigation indicated that Lieutenant Filbeck may have been involved in assisting Major Overbey with removing the carburetor from the impounded vehicle as well as providing him with prescription pain medication. As a result of the investigation, Sheriff Pope gave Lieutenant Filbeck a written reprimand (Doc. 59 at 111) and forced Major Overbey to resign (Doc. 58 at 290; *see also* Doc. 35 at 135:20-136:9).

The case was presented to the Grand Jury, who ultimately decided not to indict Major Overbey. (*See* Doc. 57 (the "Grand Jury Presentment").) Nevertheless, the Grand Jury charged the county manager with establishing a "community advisory board to review operational procedures involving all aspects of the Butts County Sheriff's Office, including but not limited to the following: seized property and evidence, impound procedures, surveillance cameras, disciplinary action and follow up procedures, and random on site property and drug checks of employees." (Doc. 57 at 3.) Sheriff Pope subsequently followed up with the county manager about establishing the community advisory board, but the county manager represented that he did not have the authority to create such a board. As such, no further action was taken. (Doc. 35 at 205:3-6.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323 (1986); *Barreto v. Davie*

*Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 586 (citations and internal quotations omitted). Instead, the nonmovant must point to evidence in the record that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form"). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## ANALYSIS

### I.   Section 1983 Claims

#### A.   Claims against Lieutenant Filbeck in his Individual Capacity

Lieutenant Filbeck moves for summary judgment on Plaintiffs' false arrest claims arguing that Plaintiffs' claims are barred by the existence of probable cause and qualified immunity. Plaintiffs, on the other hand, contend that Lieutenant Filbeck knew they were authorized to be at the Property and prepare it for resale and thus violated their Fourth

Amendment right to be free from unreasonable search and seizure when he ordered their arrest on February 22, 2011.[5]

It is well established that "[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). "The existence of probable cause at the time of arrest, however, constitutes an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (citation omitted). "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (internal quotation marks and citations omitted). "This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007).

"Intertwined with the question of probable cause is the issue of qualified immunity." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990). "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Kingsland*, 382 F.3d at (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "An officer acts within the scope of his discretionary authority when his conduct is undertaken pursuant to the performance of his official duties." *Clark v. City of Atlanta*, 544 F. App'x 848, 852 (11th Cir. 2013) (citing *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)). Courts consider

---

[5] The Court notes that Lieutenant Filbeck did not actually arrest Plaintiffs; he simply ordered their arrest. Nevertheless, "a non-arresting officer who instigates or causes an unlawful arrest can still be liable under the Fourth Amendment." *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007).

"whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were in his power to utilize." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Here, it is undisputed that Lieutenant Filbeck was acting within the scope of his discretionary authority when he ordered Plaintiffs' arrest on February 22, 2011.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Kingsland*, 382 F.3d at 1232. Whether a plaintiff meets this burden involves two discrete inquiries. First, the Court asks "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). As noted above, an arrest without probable cause violates the Fourth Amendment. *Ortega*, 85 F.3d at 1525. Second, the Court asks "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[6] *Pearson*, 555 U.S. at 232. In wrongful arrest cases, the Eleventh Circuit has "defined the 'clearly-established' prong as an 'arguable probable cause' inquiry." *Moran v. Cameron*, 362 F. App'x 88, 93 (11th Cir. 2010) (citations omitted); *Poulakis v. Rogers*, 341 F. App'x 523, 526 (11th Cir. 2009). Thus, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *Kingsland*, 382 F.3d at 1232 (quotation marks omitted). The standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs. *Rushing v. Parker*, 599 F.3d 1263, 1266 (11th Cir. 2010); *Kingsland*, 382 F.3d at 1231 ("The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation.").

---

[6] The Court may consider either of these factors in the sequence it deems appropriate. *Pearson*, 555 U.S. at 236.

### 1.   Probable Cause

Whether an officer possesses arguable probable cause to make an arrest depends on the elements of the alleged crime and the operative fact pattern. *Skop,* 485 F.3d at 1137-38 (citing *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004)). Showing arguable probable cause does not, however, require proving every element of a crime. *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply. *Skop*, 485 F.3d at 1138; *Lee v. Ferraro*, 284 F.3d 1188, 1195-96 (11th Cir. 2002) (noting that "the validity of an arrest does not turn on the offense announced by the officer at the time of the arrest") (internal citations and quotations omitted).

Lieutenant Filbeck contends that he had arguable probable cause to arrest Plaintiffs for three possible crimes: burglary in the second degree,[7] criminal trespass,[8] and theft by taking.[9] (Doc. 46-1 at 12.)  In support, Lieutenant Filbeck avers that he remained in lawful possession of the Property, despite the foreclosure sale on January 4, 2011, as a tenant at sufferance. Thus, because no eviction notice had been filed, Lieutenant Filbeck contends that probable cause existed to arrest Plaintiffs for the alleged crimes on February 22, 2011.

Under Georgia law, "[w]here former owners of real property remain in possession after a foreclosure sale, they become tenants at sufferance." *Steed v. Fed. Nat. Mortg. Corp.*, 689 S.E.2d 843, 848 (Ga. Ct. App. 2009). "A landlord-tenant relationship exists between a legal title holder and a tenant at sufferance such that the dispossessory procedures set forth in OCGA § 44-7-50 et seq. are applicable." *Id.*  Pursuant to O.C.G.A. § 44-7-50 et seq., "[t]he exclusive method whereby a landlord may evict a tenant is through a properly instituted dispossessory action." *Id.*  However, "when a former owner yields possession of the

---

[7] "A person commits the offense of burglary in the second degree when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant building, structure, vehicle, railroad car, watercraft, or aircraft." O.C.G.A. § 16-7-1(c).

[8] "A person commits the offense of criminal trespass when he or she intentionally damages any property of another without consent of that other person and the damage thereto is $500.00 or less or knowingly and maliciously interferes with the possession or use of the property of another person without consent of that person." O.C.G.A. § 16-7-21(a).

[9] "A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." O.C.G.A. § 16-7-2.

property at some point after the sale, but then later reenters the property, he is an intruder." *Id.* It follows, then, "that if a former owner is not in possession of the property at the time of the foreclosure sale or subsequently goes out of possession, but then later reenters the property aware that a foreclosure sale has already taken place, the former owner is a mere intruder, and the legal title holder is not required to follow the dispossessory procedures set forth in OCGA § 44-7-50 et seq." *Id.*

Plaintiffs contend that Lieutenant Filbeck abandoned the Property when he and his family ceased residing there in early November 2010, and thus no eviction notice was required in order to secure and clean out the Property. According to Plaintiffs, Lieutenant Filbeck was nothing more than a mere intruder upon reentering and boarding up the windows, nailing the doors shut, and affixing keep-out signs to the home on January 30, 2011.

It is undisputed that Lieutenant Filbeck and his family vacated the Property in November 2010, when they moved to 446 James Moore Drive and began eating, sleeping, and receiving mail there. Further, between December 12, 2010 and January 15, 2011, MDM visited the Property on multiple occasions and observed the home in disarray with "mold in the sink, no power to the house and cobwebs from wall to wall in almost every room." (Doc. 52-2 at ¶ 12.) Tina Carter also confirmed that the utilities had been disconnected, and personally spoke with a neighbor of the Property who represented that no one was living there. In fact, according to Officer Middleton, it was clear that no one was living at the Property when he responded to MDM's call on January 31, 2011. (Doc. 29 at 27:8-15.) Construing these facts in the light most favorable to Plaintiffs, Lieutenant Filbeck abandoned the Property in November 2010. *See Dickinson v. Countrywide Home Loans, Inc.*, No. 10-CV-688, 2012 WL 163883, at *6 (W.D. Mich. Jan. 19, 2012) (finding that bank's agent "could have reasonably assumed that the [plaintiffs] had abandoned the Property because they were not occupying it at the time, the electricity was turned off, and there was no indication that it was occupied"). As such, Plaintiffs were not required to file a dispossessory action in order to evict Lieutenant Filbeck.

Citing Paragraph 9(c) of the Security Deed, Plaintiffs further contend that they were authorized, at the direction of Ocwen, to enter and secure the Property, including cleaning it out and preparing it for resale.  Paragraph 9 of the Security Deed states, in relevant part, that "[i]f (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property . . . including protecting and/or assessing the value of the Property, and securing and/or repairing the Property." (Doc. 59 at 64.) "Georgia law recognizes that 'the common law right to the exclusive use and possession of property may be modified by agreement, in which the landowner grants permission to enter his property under certain circumstances.'" *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1134 (11th Cir. 2014) (quoting *Tacon v. Equity One, Inc.*, 633 S.E.2d 599, 604 (Ga. Ct. App. 2006)). Here, Paragraph 9 so modified Lieutenant Filbeck's exclusive right to the possession of the Property. Indeed, Paragraph 9 unambiguously granted Ocwen and its duly authorized agents the right to enter the premises if Lieutenant Filbeck defaulted under the Security Deed *or* abandoned the Property. *See Bates*, 768 F.3d at 1134 (dismissing action for trespass against bank because the deed authorized bank and its agent to inspect the property upon borrower's default); *Tacon*, 633 S.E.2d at 604 (finding that under the terms of the security deed, plaintiffs waived their absolute right to the exclusive use and possession of the property upon defaulting on the loan, and that defendant were therefore authorized "to enter the house, regardless of whether it still held personal items [of the plaintiff], to secure the premises and protect its interest in the property"); *see also Farinacci v. City of Garfield Heights*, 461 F. App'x 447, 452 (6th Cir. 2012) (affirming that "[w]hen [plaintiff] signed her mortgage, which included the property preservation provisions, she expressly assumed the risk that, if it became necessary to preserve the property, the bank might permit its agents and others to enter the house to effectuate that purpose"); *Lupas v. U.S. Bank, NA*, No. 11-14584, 2012 WL 3758037, at *7 (E.D. Mich. Aug. 30, 2012) (dismissing claim for trespass where the language of the mortgage clearly authorized defendant's entry onto the property for the purpose of securing it in the event plaintiffs vacated or failed to fulfill their obligations under the mortgage); *Paatalo v. J.P. Morgan Chase*

*Bank, N.A.*, No. 10-CV-119, 2012 WL 2505742, at *10-11 (D. Mont. June 28, 2012) ("Because [plaintiff] was in default, paragraph 9 of the Deed of Trust . . . gave Chase the right to access the property"); *Dickinson*, 2012 WL 163883, at *6 (holding that "paragraph 9 grants the mortgagee the unconditional right to enter the premises if the mortgagor defaults, and nothing therein requires that mortgagee to contact the mortgagor before entering the premises").

It is undisputed that Lieutenant Filbeck had defaulted by September 2010, when Ocwen notified him that it had initiated foreclosure proceedings on the Property. Thus, Lieutenant Filbeck was on notice that he no longer retained exclusive possession of the Property and that Ocwen had the right to secure and prepare it for resale months before Plaintiffs were arrested on February 22, 2011. Therefore, regardless of whether or not Lieutenant Filbeck abandoned the Property, Plaintiffs were lawfully authorized to enter the Property and protect Ocwen's interest therein, including securing the Property for resale.

The inquiry, however, is not whether Plaintiffs in fact committed a crime, but whether Lieutenant Filbeck had probable cause to believe a crime was being committed at the time of Plaintiffs' arrest. *See Harvey v. City of Stuart*, 296 F. App'x 824, 828 (11th Cir. 2008) (holding that whether plaintiff was "actually trespassing is not relevant to whether the officers had probable cause at the time of the arrest"). Taking Plaintiffs' version of the facts as true, Lieutenant Filbeck knew at the time of Plaintiffs' arrest: (i) that he defaulted under the Security Deed as early as July 2010; (ii) that Ocwen initiated foreclosure proceedings as early as September 2010; (iii) that he ceased residing at the Property in November 2010; (iv) that Ocwen published the foreclosure sale in the local newspaper in December 2010; (v) that the Property was in fact foreclosed upon by Ocwen in January 2011; (vi) that upon defaulting under the Deed or abandoning the Property, he no longer retained exclusive possession of the Property; (vii) that Ocwen, through its agent Altisource, did in fact hire MDM to secure the Property and prepare it for resale; and (viii) that Plaintiffs worked for MDM and were therefore authorized by Ocwen, the rightful owner, to enter and clean out the Property. In light of these facts, a jury question exists as to whether a reasonable police officer in the same circumstances and possessing the same knowledge as Lieutenant Filbeck

could have believed that probable cause existed to arrest Plaintiffs for any of the alleged crimes.

Furthermore, the crimes for which Lieutenant Filbeck purportedly had probable cause to arrest Plaintiffs not only required Plaintiffs' actions to be unlawful, they also required Plaintiffs to have specific intent – *i.e.*, to intentionally commit a felony or theft within the Property, to knowingly or maliciously interfere with the possession or use of the Property, or to intentionally deprive Lieutenant Filbeck of his personal property. *See Dillard v. State*, 753 S.E.2d 772, 774 (Ga. Ct. App. 2013) ("Burglary is a specific intent crime—the State must prove that the defendant intended to commit a felony after making an unauthorized entry.") (citation omitted); *Bowman v. State*, 376 S.E.2d 187, 188-89 (1989) (finding that criminal trespass requires the state to prove specific intent); *Brown v. State*, 692 S.E.2d 9, 11 (Ga. Ct. App. 2010) (noting for theft by taking, "[t]he evidence must show that the requisite intent to deprive the owner of the property was present at the time of the taking." (internal quotation marks omitted)); *Phillips v. State*, 338 S.E.2d 57, 58 (Ga. Ct. App. 1985) ("[T]heft by taking . . . is a specific intent crime."). While the Court recognizes that "it is not necessary that an officer prove every element of the crime before making an arrest," *Rhodes v. Kollar*, 503 F. App'x 916, 924 (11th Cir. 2013) (citations omitted), this rule must be applied with an eye to the core probable cause inquiry; namely, that "[p]robable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances." *Kingsland*, 382 F.3d at 1226.

Taking the facts as presented by Plaintiffs as true, Lieutenant Filbeck knew at the time of Plaintiffs' arrest that Ocwen had foreclosed on the Property and hired MDM to clean it out. Lieutenant Filbeck also knew that when Officer Middleton met with Greg Carter on January 31, 2011, Greg Carter showed him the Authorization Letter and gave a written statement stating that Plaintiffs were simply on the Property at the direction of MDM to prepare it for resale. A reasonable police officer possessing this knowledge objectively could not have concluded that Plaintiffs harbored the requisite intent to commit any of the alleged crimes. *See Killmon v. City of Miami*, 199 F. App'x 796, 800 (11th Cir. 2006) (holding that officers did not have arguable probable cause to arrest plaintiffs for trespass

where "[o]fficers should have known that the [plaintiffs] were not on the [property] willfully" and thus lacked the requisite intent); *Kleinschnitz v. Phares*, No. 13-CV-0209, 2013 WL 5797621, at *5 (M.D. Ala. Oct. 28, 2013) (finding that "[defendant] lacked arguable probable cause to arrest [plaintiff] for obstruction because [defendant] had information that would establish to a reasonable officer that [plaintiff] lacked the necessary mens rea of intent"); *Ruffino v. City of Hoover*, 891 F. Supp. 2d 1247, 1271 (N.D. Ala. 2012) (denying summary judgment for defendants where they did "not specify any facts that would lead a reasonable officer to believe that [plaintiff] pushed [officer] with the intent to harass, annoy, or alarm him," the specific intent required for harassment); *see also Garrison v. Hadder*, No. 12-CV-2659, 2012 WL 5427708, at *6 (N.D. Ala. Nov. 5, 2012) (denying motion to dismiss on the basis of qualified immunity where "nothing alleged in Plaintiff's Amended Complaint indicates he had specific intent"). Accordingly, a jury question exists as to whether it was objectively reasonable for Lieutenant Filbeck to infer, given the totality of the circumstances, that Plaintiffs possessed the intent necessary to commit any of the alleged crimes..

Because questions of fact exist as to (i) whether Lieutenant Filbeck knew or should have known that Plaintiffs were lawfully authorized to enter and secure the Property and (ii) whether a reasonable police officer in the same circumstances and possessing the same knowledge as Lieutenant Filbeck could have reasonably inferred that Plaintiffs possessed the requisite intent to commit any of the alleged crimes, the question of whether probable cause or arguable probable cause existed is a question best suited for the jury.

## 2. *Objective Good Faith*

The inquiry does not end there. "While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity." *Skop*, 485 F.3d at 1137. "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Von Stein*, 904 F.2d at 579 (quotation marks and ellipses omitted); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.") (internal punctuation omitted). Thus,

qualified immunity will protect officers who objectively make good faith mistakes. *See Post v. City of Ft. Lauderdale, Fla.*, 7 F.3d 1552, 1558 (11th Cir. 1993) (finding arguable probable cause existed where officers erroneously counted people in excess of a restaurant's maximum capacity because officers mistake was reasonable); *see also Graham v. Connor*, 490 U.S. 386, 399 n. 12 (1989) (noting that an "officer's objective 'good faith' . . . may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983"); *Scott v. Dixon*, 720 F.2d 1542, 1547 (11th Cir. 1983) (holding that law enforcement officers "acquire qualified immunity only for the good faith performance of their duties" under an objective standard).

Qualified immunity will not, however, protect officers whose conduct "creates factual issues as to their honesty and credibility." *Kingsland*, 382 F.3d at 1233. Nor will qualified immunity protect officers who abuse their position of authority to further their personal gain or settle a private dispute. *See Skop*, 485 F.3d at 1143 (denying summary judgment on the issue of qualified immunity where the officer's actions, if true, were "an abuse of his authority"); *Scott*, 720 F.2d at 1547-48 (finding a question of fact existed as to officers' good faith where they allowed defendant to use a criminal warrant to try to collect a debt). The relevant inquiry, then, is whether Lieutenant Filbeck, acting in good faith, could reasonably but mistakenly have believed that Plaintiffs committed a crime warranting their arrest.

The record demonstrates that Plaintiffs, along with Tina Carter, repeatedly attempted to provide Lieutenant Filbeck with proof of MDM's authority to secure the Property. Lieutenant Filbeck, however, refused to review the Authorization Letter or investigate Plaintiffs' claims. While "a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," he or she may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts." *Kingsland*, 382 F.3d at 1229 (internal quotation and citations omitted). Nor may an officer "turn a blind eye" and "choose to ignore information that has been offered to him or her." *Id.* at 1128-29.

Under the circumstances presented here, an objectively reasonable officer would have, at a minimum, reviewed the Authorization Letter – which identified Tina Carter as

Ocwen's agent and provided contact information for an Altisource representative – and attempted to verify Plaintiffs' authority to be at the Property by contacting either Altisource or Ocwen. Had Lieutenant Filbeck done so, it would have been clear that Plaintiffs were authorized to secure the Property and certainly lacked the necessary intent to commit any of the alleged crimes. This is particularly true in light of Plaintiffs' allegations that Lieutenant Filbeck knew Ocwen had foreclosed on the Property and, through Altisource, hired MDM to secure and prepare it for resale. As Sheriff Pope stated, "[a]ssuming that Mr. Filbeck saw [the Notice] and knew what it was and understood what it was, he should have contacted [MDM]." (Doc. 35 at 96:4-6.) And, "[i]f [Lieutenant Filbeck] had spoken to somebody with the lending institution who had the authority to send someone down and he knew they had the authority to send someone down to do exactly what they were doing, he should not have made the arrest." (Doc. 35 at 20: 17-22.) However, Lieutenant Filbeck "consciously and deliberately" chose not to "uncover reasonably discoverable, material information." *Kingsland*, 382 F.3d at 1229-30. As such, to the extent Lieutenant Filbeck chose to ignore readily available evidence that Plaintiffs were lawfully at the Property and did not possess the requisite intent to commit any of the alleged crimes, his stubbornly held belief that Plaintiffs were breaking the law cannot be said to constitute a good faith mistake justifying the application of qualified immunity. *See Battiste v. Lamberti*, 571 F. Supp. 2d 1286, 1296-97 (S.D. Fla. 2008) (denying summary judgment on the issue of qualified immunity where factual questions existed regarding what the officers knew, "how easily they could have investigated [plaintiffs'] claims, and generally whether an officer in those circumstances should have known that Plaintiffs were not on the [property] willfully").

Indeed, Lieutenant Filbeck's failure to reasonably investigate the circumstances surrounding Plaintiffs' arrest is consistent with his actions taken on January 30, 2011, when he visited the Property and discovered that some of his personal effects were missing. Although MDM posted the Notice, which Lieutenant Filbeck allegedly discovered on January 30, 2011, Lieutenant Filbeck never attempted to contact anyone at Ocwen, Altisource, or MDM regarding MDM's entry onto the Property or the removal of any of his property. Instead, he boarded up the windows, nailed the doors shut, removed the Notice,

and affixed keep-out signs to the front of the Property. In addition, he allegedly filed a false police report under the name of another officer and submitted a fraudulent insurance claim to Liberty Mutual Insurance to recover for his missing property. Because these actions "create[] factual issues as to [Lieutenant Filbeck's] honesty and credibility" and his objective good faith, qualified immunity does not apply. *Kingsland*, 382 F.3d at 1233; *see also Holmes*, 321 F.3d 1083-84 (reversing the grant of qualified immunity as factual questions existed as to officer's truthfulness).

Lieutenant Filbeck's questionable conduct surrounding Plaintiffs' arrest is analogous to that of the defendant in *Motes v. Myers*, 810 F.2d 1055 (11th Cir. 1987). There, the plaintiff alleged that the defendant, a sergeant with the local city police department, violated her constitutional rights by swearing out a false arrest warrant in order to settle a dispute between the parties regarding the ownership of an air conditioner. *Id.* at 1056-57. Observing that the Eleventh Circuit recognizes "a cause of action under § 1983 for false arrest and imprisonment motivated by the desire to settle a private dispute," the court held that the resolution of plaintiff's case depended upon whether defendant "abused the state warrant process to settle a private dispute." *Id.* at 1059-60 (citations omitted). Because the evidence indicated that the defendant knew that the plaintiff disputed the defendant's ownership of the air conditioner but "never attempted to settle the dispute," the court concluded that "[i]t remain[ed] for the jury to decide whether [the defendant] believed, in good faith, that a crime had been committed . . . or whether [the defendant] swore out the warrant to coerce settlement of a private disagreement or to harass [the plaintiff]." *Id.* at 1060.

Here, as in *Motes*, a jury question exists as to whether Lieutenant Filbeck abused his position of authority as a law enforcement officer by ordering Plaintiffs' arrest in order to settle a private disagreement regarding his legal status *vis-à-vis* the Property or to harass the Plaintiffs for their part in the dispute. While the Court acknowledges that *Motes* did not specifically address the issue of qualified immunity, as it was uncontroverted that the defendant was not acting in his official capacity as a police officer at the time of the plaintiffs' arrest, *id.* at 1059, the Court nevertheless finds the good faith analysis in *Motes* instructive here. It would indeed be incongruous to reason that Lieutenant Filbeck would be

liable if he had abused the state warrant system to effectuate Plaintiffs' arrest, yet find him immune from liability where he abused his position of authority as a law enforcement officer to achieve the same result. Qualified immunity will not shield officers who act in bad faith by using their positions of authority to settle private disputes.[10] *See Scott*, 720 F.2d at 1547-48.

As the Eleventh Circuit has explained, "[q]ualified immunity is, as the term implies, qualified. It is not absolute. It contemplates instances in which a public official's actions are not protected." *Kingsland*, 382 F.3d at 1233 (citations omitted). Indeed, "[t]he principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect." *Id.* at 1234. Thus, "[w]hen an officer plainly violates the legal rights of the people he serves, and when a reasonable officer in his position had fair warning that his conduct was unlawful, § 1983 suits exist to provide a vehicle for recourse." *Skop*, 485 F.3d at 1144.

Here, there are genuine issues of material fact as to the existence of probable cause and arguable probable cause. There is also a genuine issue as to whether Lieutenant Filbeck acted in good faith when he ordered Plaintiffs' arrest. Accordingly, Defendants' Motion is **DENIED** as to Plaintiffs' Fourth Amendment claims against Lieutenant Filbeck in his individual capacity.

---

[10] The Court notes that other Circuits have held that "civil disputes cannot give rise to probable cause." *Allen v. City of Portland*, 73 F.3d 232, 237 (9th Cir. 1995); *Stevens v. Rose*, 298 F.3d 880, 884 (9th Cir. 2002) (holding that an officer was not entitled to qualified immunity because he "knew that the dispute was civil, not criminal"); *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (holding an officer liable for causing plaintiff to be arrested without probable cause because officer was "on notice that the dispute was a civil matter not involving criminal intent"); *Moore v. Marketplace Rest.*, 754 F.2d 1336, 1345-47 (7th Cir. 1985) (finding that there would be no probable cause to arrest for breach of contract dispute involving payment of food at restaurant). While the Eleventh Circuit analyzes such cases differently, the principal holds. To the extent that Lieutenant Filbeck believed that Ocwen was required to commence a dispossessory action before taking possession of the Property, that dispute is a civil one best "resolved in the civil, not criminal, courts. [Lieutenant Filbeck] knew or should have known this; no reasonable officer could have concluded otherwise." *Peterson v. City of Plymouth, Minn.*, 945 F.2d 1416, 1421 (8th Cir. 1991).

### B.   Claims against Sheriff Pope in his Individual Capacity

Plaintiffs seek to hold Sheriff Pope liable in his individual capacity for Plaintiffs' alleged unconstitutional arrest based on his purported policy, practice or custom in failing to discipline his deputies for "patently illegal conduct." (Doc. 52 at 19.) In support, Plaintiffs point to the GBI Report as well as the Grand Jury Presentment, which Plaintiffs assert are "tantamount to a legal determination that [Sheriff Pope] was deliberately indifferent." (Doc. 52 at 20.) Although not clearly articulated, Plaintiffs effectively contend that Sheriff Pope should be held liable in his individual capacity under the theory of supervisory liability. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley*, 193 F.3d at 1269). Rather, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.* Here, Plaintiffs' claims against Sheriff Pope fail as a matter of law.

First, Plaintiffs have failed to establish that Sheriff Pope personally participated in the alleged constitutional violation. Although Sheriff Pope expressed indifference to Sergeant Mundy's complaint and allegedly spoke with Tina Carter about Plaintiffs' arrest, Plaintiffs have not presented any evidence that Sheriff Pope was apprised of the arrest as it was happening or that he was in a position to intervene. Indeed, Plaintiffs have failed to introduce any facts to support an inference that Sheriff Pope directed Lieutenant Filbeck to act unlawfully or knew that Lieutenant Filbeck would act unlawfully prior to Plaintiffs' arrest but failed to stop him from doing so. In short, Sheriff Pope's *post hoc* actions cannot serve as a basis for holding him liable. *See Richardson v. Quitman Cnty., Ga.*, 912 F. Supp. 2d 1354, 1380 (M.D. Ga. 2012) (finding that sheriff's "*post hoc* approval of the actions in question could not have possibly been the cause of these actions because they had already occurred"); *Gainor v. Douglas Cnty., Ga.*, 59 F. Supp. 2d 1259, 1293 (N.D. Ga. 1998) ("A *post hoc* approval of an action already taken could not possibly be the motivating force for causing the action to be taken.").

Because the record is devoid of any evidence that Sheriff Pope personally participated in the events prior to or during Plaintiffs' arrest, to survive summary judgment, Plaintiffs must establish the requisite causal connection.

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, it can be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Cotton*, 749 F.3d at 1360 (internal quotations and citations omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1048 (11th Cir. 2014) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999). In sum, "[t]he standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Cotton*, 749 F.3d at 1360 (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)).

Plaintiffs point to the GBI Report and the Grand Jury Presentment as evidence that Sheriff Pope knew or should have known of Lieutenant Filbeck's "unfitness and tendencies to abuse his position as a law enforcement officer." (Doc. 22 at ¶ 34.) The Court disagrees. The GBI Report discusses four incidents involving Major Overbey, with Lieutenant Filbeck possibly implicated in two – removing a carburetor from a seized vehicle and providing Major Overbey with prescription pain medication. None of these incidents, however, involved unconstitutional arrests. Rather, as the Grand Jury Presentment makes clear, the incidents outlined in the GBI Report concerned officer misconduct relating to seized property and evidence, impound procedures, and drug use. Nowhere in the GBI Report does it discuss arrests without probable cause. Indeed, Plaintiffs have set forth no evidence of past arrests made without probable cause. Thus, Plaintiffs have failed to establish that Sheriff Pope had a policy or custom that allegedly *caused* their unlawful arrest. Plaintiffs' conclusory allegations to the contrary are insufficient to meet the "extremely rigorous" standard necessary to impose supervisory liability. *Cotton*, 749 F.3d at 1360.

Even if a sufficient nexus existed between the conduct involved in the GBI Report and Plaintiffs' unlawful arrest, Plaintiffs' claims would still fail.  As discussed, the GBI Report outlines four incidents of misconduct involving Major Overbey, with Lieutenant Filbeck possibly implicated in two. These incidents, however, do not amount to abuses so "obvious, flagrant, rampant, and of such continuous duration" as to impose supervisory liability. *See Gainor*, 59 F. Supp. 2d at 1290 (N.D. Ga. 1998) ("The allegation of two instances of past abuses does not amount to abuses so 'obvious, flagrant, rampant, and of such continuous duration' as to impose liability upon an officer's supervisor in light of the rigorous standard that must be satisfied." (citing *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)); *see generally Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) ("Demonstrating a policy or custom requires showing a persistent and wide-spread practice.") (citations and alterations omitted).

In addition, Plaintiffs' allegation that Sheriff Pope was deliberately indifferent is belied by the fact that Sheriff Pope requested the GBI investigation, reprimanded Lieutenant Filbeck, and ultimately forced Major Overbey to resign. *See Skop*, 485 F.3d at 11 (finding that department's discipline of officer in advance of lawsuit suggested that officer's conduct was inconsistent with department's practices and customs). As the Supreme Court has stated, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). Here, Plaintiffs have failed to meet this standard. Accordingly, Defendants' Motion as to Plaintiffs' claims against Sheriff Pope in his individual capacity is **GRANTED**.

### C.   Claims against Sheriff Pope and Lieutenant Filbeck in their Official Capacities

Plaintiffs have also brought suit against Sheriff Pope and Lieutenant Filbeck in their official capacities. Defendants contend that Plaintiffs' claims are barred by Eleventh Amendment immunity. The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Rather, states and their officials, acting in official capacities, are immune from suit under § 1983 pursuant to the Eleventh Amendment, which "protects a

State from being sued in federal court without the State's consent." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc); *see generally Quern v. Jordan*, 440 U.S. 332, 345 (1979) (holding that "§ 1983 does not . . . abrogate the Eleventh Amendment immunity of the States"). Thus, Eleventh Amendment immunity from suit in federal court applies not only when the state itself is sued, but also when an "arm of the state" is sued. *Manders*, 338 F.3d at 1308.

Defendants correctly contend that Sheriff Pope and Lieutenant Filbeck are entitled to Eleventh Amendment immunity because they were acting as "arms of the state" at all relevant times during Plaintiffs' arrest. The Eleventh Circuit has held that "[w]hether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged" and that courts are to consider: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* at 1308-09. In *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1347 (11th Cir. 2003) (en banc), the Eleventh Circuit unequivocally stated that a "sheriff acts on behalf of the State in his function as a law enforcement officer and keeper of the peace in general." The *Grech* court specifically noted that "under Georgia law, counties lack authority and control over sheriffs' law enforcement functions." *Id.* at 1332. Thus, counties "do[] not, and cannot, direct the Sheriff *how to arrest a criminal*, how to hire, train, supervise, or discipline his deputies, what polices to adopt, or how to operate his office." *Id.* at 1347 (emphasis added).

The Court finds that Sheriff Pope served as "an arm of the state" during the events surrounding Plaintiffs' arrest, and thus he is entitled to Eleventh Amendment immunity.[11] As

---

[11] Applying the *Manders* factors, numerous courts have found that sheriffs and their deputies serve as "arms of the state" when engaging in law enforcement functions. *See Townsend v. Coffee Cnty., Ga.*, 854 F. Supp. 2d 1345, 1352 (S.D. Ga. 2011) (finding that deputy sheriff "was acting as an 'arm of the state'" while making an investigatory stop and arrest); *Hall v. Fries*, No. 13-CV-105, 2014 WL 1389063, at *5 (M.D. Ga. Apr. 9, 2014) (finding that sheriff and deputy served as arms of the state during fatal shooting of suspect); *Davis v. Pope*, No. 11-CV-105, 2012 WL 3757653, at *2 (S.D. Ga. Aug. 28, 2012) ("[Sheriff] is entitled to Eleventh Amendment immunity on all claims asserted against him in his official capacity."); *McDaniel v. Yearwood*, No. 11-CV-165, 2012 WL 526078, at *7 (N.D. Ga. Feb. 16, 2012) (concluding that "the deputies were acting as state actors when they arrested Plaintiff . . . ."); *Lewis v. Wilcox*, No. 06-CV-29 (CDL), 2007 WL 3102189, at *9 (M.D. Ga. Oct. 23, 2007) (finding that sheriff "was acting as an 'arm of the State' when promulgating use-of-force and seizure policies in the context of ordinary law enforcement").

an employee of Sheriff Pope, Lieutenant Filbeck, in his official capacity, is likewise entitled to Eleventh Amendment immunity. *See Scruggs v. Lee*, 256 F. App'x 229, 231-32 (11th Cir. 2007) (holding that "as employees of the sheriff, deputies . . . in their official capacities, are also entitled to Eleventh Amendment immunity"). Accordingly, Defendants' Motion as to Plaintiffs' claims against Sheriff Pope and Lieutenant Filbeck in their official capacities is **GRANTED**.

### D.    Claims against Butts County

Plaintiffs also seek to hold Butts County liable under § 1983 for their alleged false arrest. As with supervisory liability, it is well-settled that "[m]unicipalities and local government units cannot be found liable under § 1983 under a *respondeat superior* or vicarious liability theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). "Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "A plaintiff . . . has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329 (citations omitted).  "Under either avenue, a plaintiff (1) must show that the local governmental entity, here the county, has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Id.* at 1330.

Here, Plaintiffs have not identified any officially promulgated policy of Butts County that caused their alleged unlawful arrest. As such, Plaintiffs must demonstrate that Butts County had an unofficial custom or practice "permitting [a constitutional violation] and that the county's custom or practice is the moving force [behind] the constitutional violation." *Id.* (internal quotation marks omitted) (second alteration in original). This unofficial custom or

practice must be "shown through the repeated acts of a final policymaker for the county." *Id.* Plaintiffs argue that Sheriff Pope, as the official policy maker for the Butts County Sheriff's Office, had a policy and practice of failing to discipline his deputies for "patently illegal conduct." (Doc. 52 at 20.) Butts County, on the other hand, contends that it is entitled to summary judgment because Sheriff Pope is not a final policymaker for Butts County and thus it did not have the authority to control Lieutenant Filbeck's actions at issue in this litigation.

Whether Sheriff Pope is a policymaker for the State of Georgia or Butts County "under § 1983 . . . is guided by state law." *Id.* In *Grech*, the Eleventh Circuit found that Georgia law "has made the sheriff a constitutionally protected office *independent* from the [county in which it operates] and prevented the [county] from taking any action to affect the sheriff's office." *Id.* at 1335 (emphasis added). The court recognized that "[i]n contrast to the State, counties have no authority or control over, and no role in, Georgia sheriffs' law enforcement function." *Id.* at 1336. "Instead, sheriffs exercise authority over their deputies *independent* from the county." *Id.* (emphasis added). Thus, the court concluded that sheriffs and their deputies are agents of the state, rather than the counties in which they serve, when performing law enforcement functions, including making arrests. *Id.* at 1333-34. Emphasizing that "a county is liable under § 1983 only for acts for which the county is actually responsible," the court therefore held that counties have "no § 1983 liability for the acts and policies of the sheriff and his employees" in their capacity as law enforcement officers. *Id.* at 147-48.

Plaintiffs' claims are predicated on their arrest by Lieutenant Filbeck. Because Butts County "does not, and cannot, direct the Sheriff [or his deputies] how to arrest a criminal," it cannot be held liable in this case. *Id.* at 1347; *see also Townsend,* 854 F. Supp. 2d at 1351 (finding that "*Grech* and its progeny make it clear that the County is not liable for Deputy Grantham's law-enforcement activities"); *Richardson*, 912 F. Supp. 2d at 1367 ("Under Georgia law, 'a county has no authority and control over the sheriff's law enforcement function' regarding certain conduct and policies and cannot incur liability under § 1983 based on the performance of those functions." (quoting *Grech*, 335 F.3d at 1347)).

Even assuming, *arguendo*, that Butts County had authority over law enforcement functions and Sheriff Pope had final policymaking authority for the County, Plaintiffs' policy and custom argument would still fail. "A policy or custom is established by showing a persistent and widespread practice and an entity's actual or constructive knowledge of such customs, though the custom need not receive formal approval." G*erman v. Broward Cnty. Sheriff's Office,* 315 F. App'x 773, 776 (11th Cir. 2009). To succeed, a plaintiff must ordinarily demonstrate "a pattern of similar constitutional violations." *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)) (alterations omitted). The practice must be "so pervasive as to be the functional equivalent of a formal policy." *Grech*, 335 F.3d at 1330 n. 6. Thus, "random acts or isolated incidents are insufficient to establish a custom or policy." *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986). As discussed above, Plaintiffs have presented no evidence of prior unconstitutional arrests that would have put Butts County or Sheriff Pope on notice of a widespread practice of abuse. Thus, Plaintiffs have failed to establish that Sheriff Pope had a policy or custom that was the "moving force" behind their alleged unlawful arrest. *Grech*, 335 F.3d at 1330.

To the extent Plaintiffs attempt to hold Butts County liable for the alleged shortcomings of the county manager, Plaintiffs have failed to establish that the county manager had final policymaking authority over the Butts County Sheriff's Office. Indeed, Plaintiffs have not submitted any evidence of the county manager's authority over law enforcement functions. That the Grand Jury charged the county manager with the task of reviewing operational procedures does not grant the county manager final policymaking authority over the Butts County Sherriff or his deputies. Further, Plaintiffs have failed to establish that the county manager was deliberately indifferent. "[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference' towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)). To establish a municipality's deliberate indifference, "a plaintiff must present some evidence that the

municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009) (citation omitted). "Prior incidents also must involve facts substantially similar to those at hand in order to be relevant to a deliberate-indifference claim." *Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013) (citations omitted). Here, as discussed above, Plaintiffs have not produced any evidence of prior false arrests that would have put either Butts County or Sheriff Pope on notice of a need to train or supervise in that area. Accordingly, Plaintiffs deliberate indifference claim fails as a matter of law.

In light of Plaintiffs' failure to produce any evidence to support their claims against Butts County, Defendants' Motion is **GRANTED**.

## II.   State Law Claims

In their original complaint, Plaintiffs asserted state law claims for assault and battery, false imprisonment, intentional infliction of emotional distress, negligent hiring and retention, and conversion. (*See* Doc. 1.) However, in their amended complaint, without referencing or adopting the original complaint, Plaintiffs have asserted state law claims only for negligent hiring and retention and conversion, apparently abandoning their state law claims for assault and battery, false imprisonment, and intentional infliction of emotional distress. (Doc. 22.) Therefore, the only state law claims that need to be resolved on summary judgment are the negligent hiring and retention claim and the conversion claim. *See Schreane v. Middlebrooks*, 522 F. App'x 845, 848 (11th Cir. 2013) ("[A]n amended complaint supersedes the initial complaint unless the amended complaint specifically refers to or adopts the initial complaint.") (internal punctuation and citation omitted). The Court will consider each of these claims in turn.

### A.   Negligent Hiring and Retention

As a threshold matter, to the extent Plaintiffs assert their negligent hiring and retention claims against Butts County or Sheriff Pope in his official capacity, such claims are barred by sovereign immunity.  In Georgia, sovereign immunity extends "to the state and all of its departments and agencies, including sheriffs and counties." *Richardson*, 912 F. Supp. 2d

at 1368. "Sovereign immunity is not an affirmative defense that must be established by the party seeking its protection. Instead, immunity from suit is a privilege that is subject to waiver by the State, and the waiver must be established by the party seeking to benefit from the waiver." *Forsyth Cnty. v. Greer*, 439 S.E.2d 679, 681 (1993) (quotation omitted). "Because suits against county officials in their official capacities are in reality suits against the county, a county official sued in his or her official capacity is entitled to the county's defense of sovereign immunity." *McDaniel*, 2012 WL 526078, at *12 (internal quotations and citations omitted). Thus, Sheriff Pope is entitled to the benefit of Butts County's sovereign immunity defense, but only to the extent the County has not waived it. *Richardson*, 912 F. Supp. 2d at 1368 (citing *Gilbert v. Richardson*, 452 S.E.2d 476, 484 (1994)). "This is true notwithstanding the Court's analysis of whether Sheriff [Pope] is properly considered an 'arm of the state' for purposes of [Plaintiffs'] Section 1983 claims." *McDaniel*, 2012 WL 526078, at *12. In short, sovereign immunity bars Plaintiffs claims against Butts County and Sheriff Pope in his official capacity, unless Plaintiffs prove that sovereign immunity has been waived. *See Seay v. Cleveland*, 508 S.E.2d 159, 161 (1998) (holding that "although [defendant] might be held liable for negligent supervision had he been sued in his personal capacity, sovereign immunity acts as a bar to such claims against a sheriff in his official capacity unless sovereign immunity has been waived") (internal citation omitted).

"In Georgia, sovereign immunity may be waived only if a statute expressly provides that sovereign immunity is waived and the extent of such waiver." *Grech*, 335 F.3d at 1341 (citations omitted). Pursuant to O.G.C.A. § 36-33-1, a municipality may waive its immunity by purchasing liability insurance, but only if "the policy of insurance issued covers an occurrence for which the defense of sovereign immunity is available, and then only to the extent of the limits of such insurance policy." *See also Kitchen v. CSX Transp., Inc.*, 6 F.3d 727, 731 (11th Cir. 1993) ("[W]hen the plain terms of the county's insurance policy provide that there is no coverage for a particular claim, the policy does not create a waiver of sovereign immunity as to that claim.").

Plaintiffs conclusively assert that "Butts County purchased insurance to cover Plaintiffs' law enforcement related claim." (Doc. 52 at 10.) However, Plaintiffs have not

offered any evidence or argument that the insurance policy covers liability for negligent hiring and retention. In other words, Plaintiffs' conclusive assertions regarding the purchase of an insurance policy "to cover Plaintiffs' law enforcement related claim" are insufficient to establish waiver. Thus, Plaintiffs' negligent hiring and retention claims against Butts County and Sheriff Pope in his official capacity are barred by sovereign immunity.

Likewise, Plaintiffs' claims against Sheriff Pope in his individual capacity are barred by the doctrine of official immunity, which "provides that a public officer or employee in his individual capacity may be personally liable only for ministerial acts negligently performed or discretionary acts performed with malice or intent to injure." *Carter v. DeKalb Cnty., Ga.*, 521 F. App'x 725, 731 (11th Cir. 2013) (citations omitted). "[The Georgia Court of Appeals] has consistently held that the operation of a police department, including the degree of training and supervision to be provided its officers, is a *discretionary governmental function* as opposed to a ministerial, proprietary, or administratively routine function." *Harvey v. Nichols*, 581 S.E.2d 272, 276-77 (Ga. Ct. App. 2003) (collecting cases) (emphasis added).

As Sheriff Pope's alleged misconduct is discretionary and as "public officials are immune from damages that result from their performance of discretionary functions, unless those functions were undertaken with malice or intent to cause injury," *Carter v. Glenn*, 548 S.E.2d 110, 112 (Ga. Ct. App. 2001), Sheriff Pope is entitled to official immunity unless Plaintiffs demonstrate malice or intent to cause injury. "For purposes of official immunity, 'actual malice requires a deliberate intention to do wrong, and denotes express malice or malice in fact. It does not include willful, wanton or reckless conduct or implied malice.'" *McDaniel*, 2012 WL 526078, at *19 (quoting *Daley v. Clark*, 638 S.E.2d 376, 386 (Ga. Ct. App. 2006). Here, Plaintiffs have failed to introduce any evidence suggesting that Sheriff Pope acted with the deliberate intention to harm Plaintiffs. Therefore, Sheriff Pope is entitled to official immunity as to Plaintiffs' negligent hiring and retention claims.

As Plaintiffs' negligent hiring and retention claims are barred by sovereign and official immunity, Defendants' Motion is **GRANTED**.

### B.   Conversion

Defendants have moved for summary judgment on Plaintiffs' claim for conversion, contending that Plaintiffs have failed to make out a *prima facie* case. Georgia has codified the common law action of trover and conversion under O.C.G.A. § 51-10-1, which provides that "[t]he owner of personalty is entitled to its possession. Any deprivation of such possession is a tort for which an action lies." *See generally Grant v. Newsome*, 411 S.E.2d 796, 797 (1991) ("[O.C.G.A. § 51-10-1] embodies the common law action of trover and conversion.") (citations omitted). Georgia courts have construed O.C.G.A. § 51-10-1 as authorizing "recovery of damages when a government official, without lawful authority, deprives an individual of his or her property on even a temporary basis." *Romano v. Georgia Dep't of Corr.*, 693 S.E.2d 521, 524 (2010) (citation omitted).  To establish a claim for a conversion, "the plaintiff must prove the following five elements of the tort: (1) proof of ownership or title in the plaintiff to the disputed property, or the plaintiff's right to immediate possession of the property; (2) actual possession of the property by the defendant; (3) demand by the plaintiff for the return of the property; (4) the defendant's refusal to return the property; and (5) the value of the property." *Eleison Composites, LLC v. Wachovia Bank, N.A.*, 267 F. App'x 918, 923 (11th Cir. 2008).

Here, Plaintiffs contend that Defendants converted silverware, twenty dollars in cash, and two cameras. However, the facts as presented by the Defendants leave open genuine issues of material fact that would be better decided upon a more fully developed factual record that will be established at trial. Accordingly, Defendants' Motion is **DENIED**.

### CONCLUSION

In light of the forgoing, Defendants' Motion for Summary Judgment (Doc. 46) is **GRANTED** in part and **DENIED** in part. In addition, Plaintiffs' Motion to Strike (Doc. 65) is **DENIED**, and Defendants' Motion for Leave to File Reply Brief (Doc. 66) is **GRANTED**.

**SO ORDERED**, this 1st day of June, 2015.

  /s/ Leslie J. Abrams
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**